Bryan Hurlbutt (ISB # 8501)
Laurence ("Laird") J. Lucas (ISB # 4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org
llucas@advocateswest.org

Roger Flynn (*pro hac vice pending*) (Colo. Bar # 21078)
WESTERN MINING ACTION PROJECT
P.O. Box 349
Lyons, CO 80540
(303) 823-5738
(303) 823-5732 (fax)
wmap@igc.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, and GREATER YELLOWSTONE COALITION | Case No. 1:22-cv-225 |
| *Plaintiffs*, | |
| v. | **COMPLAINT** |
| U.S. FOREST SERVICE, | |
| *Defendant*. | |

## NATURE OF THE ACTION

1.      This action challenges the U.S. Forest Service's November 2021 approval of the Kilgore Gold Exploration Project ("Kilgore Project"). This Court issued decisions in 2019 and 2020 reversing, remanding, and vacating the Forest Service's prior approval of the Kilgore

Project for violating the National Environmental Policy Act ("NEPA"), because the Forest Service failed to take a hard look at the risks of exploration drilling to water quality and fish.

2.     During those proceedings, then-project proponent Otis Gold Corp. was acquired by Excellon Resources, a Canadian mining company. Excellon has continued to seek Forest Service approval for the Kilgore Project, a five-year exploration drilling proposal on the Caribou-Targhee National Forest. The Kilgore Project is in the Greater Yellowstone Ecosystem and in the Centennial Mountains along Idaho/Montana border—a critically-important area for grizzly bear, wolverine, lynx, bighorn sheep, whitebark pine, and Yellowstone cutthroat trout.

3.     Even though this Court previously reversed and remanded for the Forest Service to collect baseline information and fully analyze potential impacts of the proposed exploration, the Forest Service re-approved the Kilgore Project in November 2021, still without adequate baseline information, monitoring, or protective measures, again violating NEPA. Additionally, new information and new circumstances have arisen since the Kilgore Project's prior approval, but the Forest Service failed to fully analyze these changes, in violation of NEPA. For example, a new logging project, the "Porcupine Lookout Vegetation Project," will overlap with the Kilgore Project, but the Forest Service failed to properly assess and misleadingly downplayed the potentially significant adverse cumulative effects of the two projects, in violation of NEPA.

4.     Despite its potentially significant and highly uncertain effects, the Forest Service approved the Kilgore Project through an Environmental Assessment ("EA") and Decision Notice and Finding of No Significant Impact ("DN/FONSI"), refusing to prepare an Environmental Impact Statement, in violation of NEPA. The Forest Service also violated NEPA by refusing to consider alternatives to Excellon's proposal, even though Plaintiffs proposed feasible alternatives that would allow Excellon to complete its drilling proposal but with less environmental damage.

5.      In part, these errors follow from the Forest Service's decision on remand to apply the Council on Environmental Quality's (CEQ) 2020 NEPA regulations, which were adopted at the Trump Administration's urging to "simplify and accelerate the NEPA review process." Exec. Order No. 13807, 82 Fed. Reg. 40,463 (Aug. 24, 2017). Although there are several pending cases challenging the 2020 regulations as inconsistent with the core tenets of NEPA, the Forest Service elected to apply the 2020 regulations and ignored the Kilgore Project's likely significant effects.

6.      Finally, the Forest Service also violated the Forest Service Organic Act of 1897 (establishing the National Forest system) and applicable mining regulations by failing to adopt reasonable measures to minimize harm to fish, wildlife, and the environment.

7.      Based on these and other violations of law, Plaintiffs request that the Court set aside and vacate the EA and DN/FONSI and enter other relief as prayed for below.

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court under 18 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, 42 U.S.C. § 4321 *et seq.*; the Organic Act of 1897 (codified as amended in scattered sections of 16 U.S.C.); the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (APA); the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; and the Equal Access to Justice Act, 28 U.S.C. §§ 2412, 2414.

9.      An actual, justiciable controversy exists between Plaintiffs and Defendant. The requested relief is therefore proper under 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 2201–2202.

10.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiff Idaho Conservation League is located in this district, and the public lands and resources in question are in this district.

11.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

**PARTIES**

12.     Plaintiff IDAHO CONSERVATION LEAGUE (ICL) is an Idaho non-profit conservation organization founded in 1973. ICL is headquartered in Boise and also has offices and staff in Ketchum, McCall, and Sandpoint, Idaho. ICL is dedicated to protecting Idaho's wild lands, clean water and air, healthy families, and way of life. Central to ICL's mission is protecting public lands and the fish and wildlife they sustain from high-risk natural resource extraction projects including mining. ICL has more than 35,000 members and supporters located across Idaho and the nation. Many ICL board members, staff, and supporters regularly use and enjoy, and have a deep personal interest in, the Caribou-Targhee National Forest, the Centennial Mountains, and the Camas National Wildlife Refuge, and in protecting and conserving their rich natural resources and fish and wildlife, including Yellowstone cutthroat trout, grizzly bear, elk, and other species threatened by the Forest Service's approval of the Kilgore Project.

13.     Plaintiff GREATER YELLOWSTONE COALITION (GYC) is a regional non-profit conservation organization dedicated to protecting and restoring the lands, waters, and wildlife of the Greater Yellowstone Ecosystem and the unique quality of life it sustains. GYC is headquartered in Bozeman, Montana, and has long maintained an office and staff in eastern Idaho. Central to GYC's mission is maintaining the integrity of national forests and wildlife corridors that are important to the Greater Yellowstone Ecosystem. Formed in 1983, GYC has approximately 90,000 supporters, including many in Idaho. Many GYC board members, staff, and supporters regularly use and enjoy, and have a deep personal interest in, the Caribou-Targhee National Forest, the Centennial Mountains, and the Camas National Wildlife Refuge,

and in protecting and conserving their rich natural resources and fish and wildlife, including Yellowstone cutthroat trout, grizzly bear, elk, and other species threatened by the Forest Service's approval of the Kilgore Project.

14.     Plaintiffs' staff, members, and supporters regularly use and enjoy the public lands and waters at and around the Kilgore Project site for recreation, conservation, scientific, aesthetic, and other uses. Plaintiffs will continue to do so in the future. Plaintiffs' staff, members, and supporters also use and enjoy fish and wildlife that live in and depend on the area for their survival. These uses will be harmed or even eliminated by the approved exploration activities.

15.     Moreover, the Forest Service's violations of NEPA injure Plaintiffs and their staff, members, and supporters by denying them the ability to adequately participate in the public review process and by denying them information concerning potential environmental impacts and other issues that NEPA requires agencies to disclose, analyze, and seek public review of prior to authorizing the Kilgore Project.

16.     Plaintiffs also suffer injury-in-fact because they have devoted time, energy, and money to protecting wildlife, water quality, and fisheries and to advocating for responsible mining in the Kilgore Project area. Plaintiffs have diverted resources from other efforts to pursue their missions and have instead used those resources to submit public comment to the Forest Service, file administrative objections, and engage with local, state, and federal officials about their concerns with the Kilgore Project.

17.     Defendant U.S. FOREST SERVICE is an agency or instrumentality of the United States within the U.S. Department of Agriculture. The Forest Service is vested with the authority and duty to manage and protect the public lands and resources of the Caribou-Targhee National

Forest. The Forest Service authorized the Kilgore Project by issuing the DN/FONSI and EA challenged herein.

18.     Defendant's violations of law, as alleged herein, injure the aesthetic, commercial, conservation, scientific, recreational, educational, wildlife preservation, and/or other interests of Plaintiffs and their staff, supporters, and members. These are actual, concrete injuries caused by Defendant's violations of law, and the judicial relief sought would remedy, in whole or in part, Plaintiffs' injuries.

19.     Plaintiffs' interests have been, are being, and will continue to be irreparably injured and harmed by Defendant's actions as challenged herein. Unless the relief prayed for herein is granted, Plaintiffs and the public will suffer irreparable harm and injury to their legally protected interests.

<u>**LEGAL BACKGROUND**</u>

**The Forest Service Organic Act of 1897**

20.     The Organic Act requires the Forest Service "to regulate [the] occupancy and use [of national forests] and to preserve the forests thereon from destruction." 16 U.S.C. § 551. The Organic Act also requires that those persons "prospecting, locating, and developing the mineral resources [on a national forest] . . . must comply with the rules and regulations covering such national forests." 16 U.S.C. § 478.

21.     The Forest Service's mining regulations require that "all [mining] operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest resources." 36 C.F.R. § 228.8. The regulations also require the Forest Service "to maintain and protect fisheries and wildlife habitat which may be affected by the operations." 36 C.F.R. § 228.8(e). The Forest Service can and must reject an unreasonable mine plan and prohibit mining

activity until appropriate evaluation of the plan is completed and reasonable mitigation measures are in place to protect public resources.

**The National Environmental Policy Act**

22.     NEPA, 42 U.S.C. §§ 4321–4370(h), requires federal agencies to take a "hard look" at the environmental consequences of their proposed actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). To take this "hard look," federal agencies must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

23.     NEPA established the Council of Environmental Quality (CEQ), housed in the Executive Office of the President, and charged the CEQ with formulating and recommending national policies that promote the improvement of the quality of the environment in light of the Congressional declaration of policy set forth in the first subchapter of NEPA. 42 U.S.C. § 4342. National policies developed by CEQ aim to foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the Nation. *Id.* § 4344.

24.     The original regulations implementing NEPA were published by CEQ in 1978. *See Implementation of Procedural Provisions, Final Regulations*, 40 Fed. Reg. 55,978 (Nov. 29, 1978). In 2020, the Trump Administration published new CEQ NEPA regulations. *See Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act; Final Rule*, 85 Fed. Reg. 43,304 (July 16, 2020) (codified at 40 C.F.R. Part 1500).

25.     On his first day in office, President Biden issued Executive Order 13990: *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate*

*Crisis*. EO 13990 states that the policy of the Biden Administration is to, *inter alia*, listen to the best available science, improve public health, and protect our environment. EO 13990 directs the heads of all agencies to review all existing regulations, orders, guidance documents, policies, and any similar agency actions promulgated, issued, or adopted between January 20, 2017, and January 20, 2021, that are inconsistent with the policy statement.

26.    CEQ has already taken steps to review and revise its 2020 regulations.

27.    The 2020 CEQ regulations apply to any NEPA process begun after September 14, 2020; for NEPA processes that were initiated before September 14, 2020, an agency "may" apply the 2020 regulations or the 1978 regulations (as amended). 40 C.F.R. § 1506.13 (2020).

28.    On remand from this Court, the Forest Service initiated the current NEPA process for the Kilgore Project prior to September 14, 2020. The Forest Service had the option of applying either the 1978 or the 2020 CEQ regulations, and it chose to apply the 2020 regulations. The Forest Service must still comply with NEPA.

29.    The scope of NEPA review is quite broad. Under the 1978 regulations, a federal agency must evaluate and disclose the direct, indirect effects, and cumulative effects of the proposed action and its alternatives on ecological, aesthetic, historic, cultural, economic, social, and health interests. 40 C.F.R. §§ 1508.7–1508.8 (1978). Cumulative effects are the impacts on the environment that result from incremental impacts of the action when added to all other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. *Id.* § 1508.7 (1978).

30.    Under the 2020 regulations, by contrast, the term "cumulative impacts" and "cumulative effects" are no longer included among the impacts that a federal agency must expressly consider. Instead, the 2020 regulations merely direct that an agency "[i]dentify

environmental effects and values in adequate detail so the decision maker can appropriately consider such effects and values alongside economic and technical analyses." 40 C.F.R. § 1501.2(b)(2) (2020).

31.     If an agency is unsure whether a proposed action may have significant environmental effects, it may prepare a shorter "environmental assessment" to determine whether an EIS is necessary. 40 C.F.R. § 1501.4(c) (1978); 40 C.F.R. § 1501.5 (2020). Under the 1978 regulations, to avoid preparing an EIS, the agency's EA and FONSI must provide a "convincing statement of reasons" why the project's impacts are insignificant. 40 C.F.R. §§ 1501.4, 1508.9, 1508.13 (1978). Under the 2020 regulations, by contrast, an agency can avoid preparing an EIS if it simply concludes the project "will not have significant effects." 40 C.F.R. § 1501.6(a) (2020). The standard under NEPA for when an agency must prepare an EIS is a "low standard." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

32.     The consideration of alternatives is at the heart of NEPA, which directs agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). *See also* 40 C.F.R. § 1502.14(a)–(c) (1978); 40 C.F.R. § 1501.2(b)(3) (2020).

33.     The Forest Service has its own NEPA regulations, also updated in 2020, which require that the Forest Service "discuss the direct, indirect, and cumulative impact(s) of the proposed action and any alternatives" in an EA. 36 C.F.R. § 220.7(b)(3)(iv). The Forest Service NEPA regulations also require that the "final analysis documents an agency assessment of the cumulative effects of the actions considered (including past, present, and reasonabl[y] foreseeable future actions) on the affected environment." *Id.* § 220.4(f).

34.     NEPA also requires the agency to fully analyze the baseline conditions of the affected environment. The establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process, because an inadequate environmental baseline precludes an accurate assessment of an action's environmental impacts. *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016); *N. Plains Resource Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011).

**The Administrative Procedure Act**

35.     The APA empowers federal courts to hold unlawful and set aside any final agency action which is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted).

## STATEMENT OF RELEVANT FACTS

**The Kilgore Project Site in the Camas-Beaver Watershed and the Centennial Mountains**

36.     The Kilgore Gold Exploration Project is a five-year program to explore for minerals on public lands in the Dubois Ranger District of the Caribou-Targhee National Forest. The Project is located in the Centennial Mountains, five miles northwest of Kilgore, Idaho, in Clark County in the Beaver and West Camas watersheds, shown in Figure 1 below.



**Fig. 1**    *Map of Camas National Wildlife Refuge, showing Beaver Creek, Camas Creek, the Centennial Mountains, and the town of Kilgore. The Kilgore Project site is about 5 miles west/northwest of the town of Kilgore.*
*(Reproduction of Map 1 in Camas National Wildlife Refuge Draft Comprehensive Conservation Plan and Environmental Assessment)*

37.     The Beaver-Camas watershed is part of the Upper Snake River Basin and is the easternmost in a series of five sink drainages there. The streams in this watershed ultimately recharge the Eastern Snake Plain Aquifer, which provides drinking water to over 300,000 Idahoans. Water is also diverted for agricultural purposes.

38.     Camas Creek and Beaver Creek both flow south from near the Kilgore Project area to irrigated agriculture lands through the Camas National Wildlife Refuge and to Mud Lake on the Snake River Plain, as shown in Figure 1 above. The Camas National Wildlife Refuge was established in 1937 to provide habitat for nesting waterfowl and resting and feeding habitat for spring and fall migrating ducks, geese, and other waterfowl. Water management is critical to the Refuge's operations. Camas Creek flows for eight miles through the Refuge and provides water to the many lakes and ponds located within the refuge boundaries.

39.     The Kilgore Project site is dissected by numerous headwater streams in the Beaver-Camas watershed, including headwater streams in the Corral Creek and West Camas Creek sub-watersheds.

40.     At the site, the Forest Service authorized Excellon to build roads and drill stations to access and drill exploration holes in four target areas, as shown in Figure 2 below: Mine Ridge; Gold Ridge; Prospect Ridge; and Dog Bone. Dog Bone Ridge is on the southwest side of the Exploration site and includes tributaries to Coral Creek, which is a tributary to Beaver Creek. The other three drilling areas (Mine Ridge, Prospect Ridge, and Gold Ridge) are on the north and east sides of the site and include tributaries to West Camas Creek.

41.     These watersheds provide habitat for aquatic sensitive species, including Yellowstone cutthroat trout and Columbia spotted frog, both of which are designated "sensitive" species by the Forest Service.



**Fig 2.**   *Reproduction of EA Fig. 1, "Project target areas and water withdrawal sites"*

42.     Corral Creek is one of the only drainages in the Beaver-Camas subbasin where Yellowstone cutthroat trout are holding on. The historic range of Yellowstone cutthroat trout includes the Yellowstone River drainage and portions of the Snake River drainage in Idaho, Wyoming, Nevada, and Utah. However, by 2005, it was estimated that Yellowstone cutthroat trout was no longer found in about 90% of its historical range due to several contributing factors, including habitat destruction and introductions of non-native fish.

43.     The Idaho Department of Environmental Quality (DEQ) considers Yellowstone cutthroat trout as "the native species and the species of greatest concern" in the Beaver-Camas subbasin. The Idaho Department of Fish and Game (IDFG) identifies a primary goal for this area to: "Protect isolated native cutthroat trout populations in the Medicine Lodge, Beaver Creek, and Camas Creek drainages and identify opportunities to restore additional cutthroat trout populations within their native range."

44.     The Kilgore Project site is also home to individuals and habitat for numerous special-status and at-risk terrestrial species of wildlife and plants, including grizzly bear, wolverine, lynx, elk, whitebark pine, and others found in the Centennial Mountains.

45.     The Centennial Mountains are an east-west trending mountain range on the Continental Divide along the Idaho-Montana border and are part of what is often called the "High Divide." The Centennials are recognized as critical wildlife habitat and a key ecological corridor for dispersing and migrating wildlife. The Centennials provide an east-west path linking the Greater Yellowstone Ecosystem (GYE) with the wild lands of central Idaho and other key ecosystems in the Northern Rockies. As shown in Figure 3 below, the most hospitable path for wolverine to travel between the GYE and other wildlands in the Northern Rockies is through the Centennial Mountains, primarily on the Idaho side of the border near the Kilgore Project site.



Fɪɢ. 4.   Map of the northern U.S. Rockies with cumulative least-cost paths between systematically placed locations (circles) in spring snow cover cells. Paths in orange are predicted to be used more often than those in cooler colors. The color of the circle corresponds to the average cost distance between that location and all other locations, based on our models. The inset graph in the upper right is the cumulative plot of average cost distance (in millions of cost units) between each systematically placed location and all other locations. The graph was divided into four modes (three within the northern U.S. Rockies, and one between the Greater Yellowstone Area and Colorado). The yellow mode has the lowest average cost distances (within the northern U.S. Rockies), the blue bars the next lowest, the pink bars (Crazy and Little Belt Mountains) have the greatest average cost distances in the northern U.S. Rockies, and the green bars show the distances between all points from Colorado to the Greater Yellowstone Area.

**_Fig. 3_**     *Map showing most-used wolverine pathways through the Northern Rockies in orange (Reproduction from Schwartz, et al., "Wolverine gene flow across a narrow climatic niche,"* Ecology *(2009))*

46.     Grizzly bear have been documented near the Kilgore Project site. The site is about

16 miles west of the recovery zone for the Greater Yellowstone Ecosystem (GYE) grizzly

population. The GYE grizzly bear is designated a "threatened" species under the Endangered

Species Act (ESA) due to its risk of becoming endangered. Primary threats to the GYE grizzly

include encounters with humans. Grizzly populations in the GYE have increased in recent

decades, and the species has expanded its range. However, to recover and persist into the future,

GYE grizzly need to increase their genetic diversity by breading with grizzlies from other

populations. The Centennial Mountains are one of the key corridors for GYE grizzly to connect

with grizzlies from other populations in the Northern Rockies, as shown in Figure 4 below.



**Figure 14.** Map (**A**) shows the estimated current distribution of grizzly bears in the U.S. Northern Rocky Mountains, with core distributions denoted by dark green and peripheral distributions denoted by light green (from Costello et al. [2019]; Kasworm et al. [2019, 2020]; and Van Manen et al. [2019]). Map (**B**) shows the estimated potential distribution of grizzly bears in the Northern Rockies with full occupancy of potential suitable habitat shown in Figure 11a. The red dots in (**B**) are dispersing/colonizing grizzly bears documented between 2005 and 2018 (see Figure 12 caption for sources). The green arrows show main connectors between ecosystems. The Nez Perce-Clearwater National Forests are delineated in yellow.

**_Fig. 4_**     *Map of current and potential future grizzly distribution and main connectors between ecosystems. (Reproduced from Mattson, "The Grizzly Bear Promised Land: Past, Present, and Future of Grizzly Bears in the Bitterroot, Clearwater, Salmon, and Selway Country" (2021))*

47.     An important food source for grizzly, whitebark pine, is found in the Kilgore Project area. On December 2, 2020, the U.S. Fish and Wildlife Service announced its proposal to list whitebark pine as a "threatened" species under the ESA due to its risk of becoming endangered. 85 Fed. Reg. 77,408 (Dec. 2, 2020). Threats to whitebark pine include destruction of and habitat loss due to activities like logging and mining on National Forest lands, as well as from white pine blister rust, mountain pine beetle, and climate change.

48.     Elk, which are regarded by IDFG as "Idaho's premier big game animal," are also found in the Kilgore Project area. The Kilgore Project is located within the Island Park Zone. In this Zone, bull elk numbers are below objectives, and IDFG calls for improving key summer, winter, and transitional elk habitats on public and private lands, among other measures. Roads open to motorized travel increase hunter access and subsequently increase elk vulnerability to harvest. Human disturbance associated with roads negatively influences elk behavior because elk vacate otherwise suitable habitat to avoid human activity.

**Prior Approval of Kilgore Project; This Court's Decisions to Remand and Vacate**

49.     In 2017, Otis Gold submitted a Plan of Operations to the Forest Service, and the Forest Service approved the Kilgore Project in August 2018 in a DN/FONSI and based on an EA. The approval authorized Otis Gold to construct over 10 miles of road and 140 drill stations to drill up to 420 exploratory holes over five years.

50.     Plaintiffs filed this suit in this Court on November 13, 2018, challenging the Forest Service's approval of the Kilgore Project under NEPA and other laws. Otis Gold intervened as a defendant in the case.

51.     Despite this pending litigation, in the fall of 2019, Otis Gold completed 1,876 feet of road construction and conducted drilling at 10 sites.

52.     On December 18, 2019, the Court granted Plaintiffs' motion for summary judgment, in part, holding that the Forest Service failed to take a "hard look" in violation of NEPA and remanding the decision to the Forest Service to "consider the impact of the Project on (1) groundwater in the Dog Bone Ridge area and (2) how that groundwater from Dog Bone Ridge drainage will impact Corral Creek and the Yellowstone cutthroat trout in Corral Creek." *Idaho Conservation League v. U.S. Forest Serv.*, 429 F. Supp. 3d 719, 723 (D. Idaho 2019).

53.     With respect to groundwater in Dog Bone Ridge, the Court noted that the Forest Service failed to gather baseline data and failed to set up monitoring sites and stated: "[T]he Forest Service does not know how groundwater will drain from Dog Bone Ridge to Corral Creek. That is troubling given the lack of monitoring on the west side and the potential for groundwater contamination caused by drilling." *Id.* at 731.

54.     With respect to Yellowstone cutthroat trout, the Court concluded: "Because the Forest Service did not do a baseline study on the Dog Bone Ridge area, and is not requiring any monitoring there, the agency does not know whether drilling will cause contaminated groundwater to flow into Corral Creek, habitat for the Yellowstone cutthroat trout, a sensitive species." *Id.* at 732.

55.     After the Court's December 2019 ruling, Otis Gold indicated that it intended to proceed with exploration outside of Dog Bone Ridge during remand.

56.     In April 2020, Excellon completed its acquisition of Otis Gold. Otis Gold became a wholly-owned subsidiary of Excellon.

57.     In May 2020, the Court granted Plaintiffs' motion to amend the judgment, vacating the Forest Service's approval of the Kilgore Project and confirming that Excellon could

not proceed with exploration activities during remand. *Idaho Conservation League v. U.S. Forest Serv.*, No. 1:18-CV-504-BLW, 2020 WL 2115436 (D. Idaho May 4, 2020).

**Forest Service Re-Approval of the Kilgore Project in 2021**

58.     In July 2020, Excellon submitted a revised Plan of Operations to the Forest Service again seeking approval of the Kilgore Project. The revised Plan of Operations was mostly the same as the previous plan: Excellon sought a five-year authorization to construct 10.2 miles of road, construct 130 drill stations, and drill up to 390 exploration holes, each to an average depth of 1,300 feet underground.

59.     In January 2021, the Forest Service released a Draft EA for the Kilgore Project and took public comment. *Id.* The Draft EA largely repeated the 2018 EA and included very limited new information responsive to the Court's remand order.

60.     On February 11, 2021, Plaintiffs submitted scoping comments, warning that the Forest Service failed to comply with Court's remand order because the Draft EA relied on minimal and inadequate new data from Dog Bone Ridge. Among other issues, Plaintiffs also warned that the Forest Service failed to consider the risk of contamination from drilling near historical mine adits, tunnels, and waste at the site, and that it failed to include important information about a new logging project—the Porcupine Lookout Vegetation Project—which the agency admitted would have negative cumulative environmental effects.

61.     Plaintiffs also identified reasonable action alternatives for the Forest Service to consider that would allow Excellon to conduct its full exploration but with potentially much less environmental impact. These included using helicopter-supported drilling to limit the mileage of new roads and limiting drilling to daylight hours only to reduce wildlife disturbance. Plaintiffs

also urged the Forest Service to prepare an EIS based on the large scale of the Kilgore Project

and its potentially significant effects to water quality, fish, and wildlife.

62.     Instead of preparing an EIS, on June 7, 2021, the Forest Service released a Final

EA. In the EA, the Forest Service considered only the "Action Alternative" (Excellon's

proposal) and the "No Action Alternative," refusing to consider any other alternatives, including

the reasonable alternatives Plaintiffs proposed in their comments.

63.     On June 7, 2021, the Forest Service also released the draft DN/FONSI, initiating a

45-day administrative objection period. The draft DN/FONSI proposed approving Excellon's

proposal based on the EA's conclusion that the Kilgore Project will have no significant effects.

64.     Plaintiffs filed a timely administrative objection on July 22, 2021, again raising

concerns that the Forest Service failed to comply with the remand order; failed to disclose,

evaluate, and mitigate against adverse impacts of Excellon's activities; unreasonably rejected

viable action alternatives that would avoid, minimize, or mitigate impacts while allowing

Excellon to complete its full drilling proposal; and should prepare an EIS, among other concerns.

65.     Following an objection resolution meeting, Plaintiffs submitted a proposal to

remedy their objections. Plaintiffs' proposal would have allowed Excellon to proceed with some

of the exploration now, while waiting on the rest of it until the Forest Service could gather more

information and consider additional alternatives and mitigation. The Forest Service rejected this

proposal, and on November 1, 2021, the Forest Service's Objection Reviewing Officer denied

Plaintiffs' objections. The Objection Reviewing Officer did direct the Forest Service to provide,

in its final decision, more rationale for rejecting the alternatives Plaintiffs had proposed.

66.     On November 12, 2021, the Forest Service issued the final DN/FONSI, approving

the Kilgore Project based on the 2021 Final EA.

**Overview of the Re-Approved Exploration**

67.     As approved, Kilgore Project operations commence annually on July 15 and last

into December, depending on conditions. During operations, Excellon is authorized drill up to 24

hours per day, seven days per week, with three drill rigs at a time. Excellon is authorized to

construct up to 130 drill stations, with up to three drill holes at each, as shown in Figure 5 below.



**Proposed Kilgore Gold Exploration**

_Fig 5_     _Reproduction of EA Fig. 2 "Proposed road and drill station locations"_

68. To access drilling areas, Excellon would construct 10.2 miles of new roads, use existing Forest Service roads and trails, and widen existing roads and trails when needed to construct its drill stations.

69. In total, Excellon would directly disturb approximately 22 acres of forest surface to construct the drill stations and roads. Noise, light, and other disturbance effects would extend beyond these 22 acres.

70. Each of the 390 drill holes would average 1,300 feet deep. Drill pads would be 50 feet long and generally as wide as the road. Excellon would put drill fluids and drill cuttings into "sumps" constructed at each drill station, with sumps measuring on average 15 feet long by 6 feet wide by 8 feet deep. Drilling fluids held in the sumps would be allowed to evaporate and infiltrate in the ground, without the use of liners to prevent infiltration. When Excellon encounters groundwater in its pressurized drill holes, as has occurred during past drilling at the site, the holes are to be backfilled and plugged to try to prevent cross-contamination.

71. To obtain drill water, and other water needed for the Exploration, Excellon is authorized to pump water from an existing on-site well and to pump water directly from two creeks: West Camas Creek and Beaver Creek.

72. Excellon would use drilling samples obtained during the Kilgore Project to assess the grade, tonnage, and extent of minerals underlying the site. In its investor communications, Excellon states that (depending on the results of exploration) the site could be suitable for an open-pit, cyanide heap-leach gold mine.[1]

---

[1] *Independent Technical Report and Preliminary Economic Assessment, Kilgore Project, Clark County, Idaho, USA,* (2019) (available at: http://www.excellonresources.com/_resources/kilgore/reports/43-101_Kilgore-PEA-26-08-2019.pdf).

73.     The Kilgore Project is larger than other exploration projects at the site. In 2014, the Forest Service approved (also through an EA and a DN/FONSI) Otis Gold's plan to construct less than a mile (3,919 feet) of road to access 16 drill sites in the Mine Ridge area, disturbing 7.1 acres of surface. In 2017, the Forest Service approved through a NEPA "categorical exclusion" Otis Gold's proposal for 0.5 acres of surface disturbance to construct timber platforms and use helicopters to drill at 34 stations in Gold Ridge and Mine Ridge.

**Adverse Impacts of the Exploration and Defects in the 2021 EA and DN/FONSI**

Drilling Impacts to Water Quality

74.     Exploration drilling can affect groundwater and surface water quality in a variety of ways. Drilling fluid and water mixing with drill cuttings can overflow into surface water and can infiltrate into groundwater and cause contamination. Groundwater can mix with other groundwater of differing chemical composition through aquifer crossflow caused while drilling, thereby cross-contaminating an aquifer. Surface water and groundwater of differing chemical composition can mix as a result of drilling and cause cross contamination.

75.     Indeed, the Forest Service admits: "Growing recognition of the ecological and socio-economic importance of groundwater and groundwater-related resources (springs and groundwater-supported wetlands and streams) has emphasized the need for the Forest Service to ensure adequate analysis of potential effects on groundwater from mineral exploration drilling . . . ." *Working Guide[:] Evaluating Groundwater Resources for Mineral Exploration Drilling* (Jul. 2020) (hereafter the "Working Guide").

76.     The Forest Service admitted that Excellon's drilling poses risks to groundwater and surface water, but the Forest Service failed to collect adequate data to determine the scope and scale of these risks. Relying on past sampling and ongoing monitoring at the site, the Forest

Service claimed contamination is unlikely and asserted that during drilling "any significant changes to field parameters, water quality constituents, or spring discharge would be reported to FS personnel" and appropriate steps would then be taken to address the problem. These conclusions, however, are not supported due to multiple flaws.

77.     First, the Forest Service lacks adequate baseline information on groundwater quality necessary to understand the impacts from Excellon's drilling. Across the entire Kilgore Project site, groundwater quality sampling has occurred at only a single location: an existing water well in one corner of the Mine Ridge target area, shown in Figure 2. No groundwater quality sampling has occurred in any of the other three target areas: Gold Ridge; Prospect Ridge; or Dog Bone Ridge—even after this Court remanded for failing to gather adequate groundwater baseline information at Dog Bone Ridge. This is concerning, because at the one location where groundwater quality sampling has occurred, selenium and zinc concentrations are high.

78.     Second, as the Forest Service admitted in project documents, it lacks adequate baseline information on hydraulic connectivity between structural elements at the site and lacks information needed to define the nature of local aquifer systems. Instead of gathering this missing information before approving the Kilgore Project, Excellon plans to do it later, after the project is well underway. After drilling, Excellon plans to retain five of its exploration drill holes (with locations not yet disclosed) for another year to conduct draw down tests to gather this missing baseline information.

79.     Not only will this information be gathered post approval, but it will be of questionable value. In fact, the Forest Service's *Working Guide* discourages this practice of using mine exploration drill holes for groundwater characterization because are they are not designed to properly perform those tasks.

80.     Third, no groundwater quality monitoring will occur during or after exploration to detect and correct any contamination. While Excellon is required to monitor water quality and flows at specified *surface* water sites during exploration, groundwater will not be monitored.

81.     Fourth, the Forest Service lacks adequate baseline information on surface water quality, further undermining its assurances that any changes in water quality caused by Excellon's drilling will be detected and corrected. Indeed, Excellon's own mining consultants warned the Forest Service that the data gathered so far from the Mine Ridge, Prospect Ridge, and Gold Ridge drilling areas fail to provide a statistically reliable baseline of existing surface water conditions. Moreover, at Dog Bone Ridge—the subject of this Court's remand, and where no surface water data had been gathered previously—the Forest Service now relies exclusively on data from just one summer of surface water sampling. During that summer, 2020, the area was experiencing an unusual drought.

82.     Fifth, the Forest Service failed to evaluate and protect against the risks of contamination from allowing Excellon to drill near historical mining features littered across the site. Excellon's 2019 Preliminary Economic Assessment and Otis Gold's 2017 Preliminary Hydrogeological Assessment mention "several collapsed underground adits" and "prospect pits" at the site, as well as a "historic mine dump" near a spring and seep at the site. The Forest Service's Working Guide warns: "These features can provide conduits to groundwater flow and/or increase the risk of groundwater and surface water contamination." But the Forest Service refused to disclose or consider where these mine features are located in relation to Excellon's drilling sites and refused to evaluate the impacts of drilling through or near them.

83.     Finally, the Forest Service failed to require Excellon to line its drilling sumps and dispose of drill cuttings off site. This is a feasible mitigation measure used in other mine

explorations. Instead, the Forest Service is allowing Excellon to use free-draining sumps, where drilling fluids and be allowed to infiltrate into the ground, creating a risk of contamination.

Yellowstone Cutthroat Trout

84.     Yellowstone cutthroat trout used to inhabit streams throughout the Kilgore Project area. However, the Forest Service now believes Yellowstone cutthroat trout have been extirpated from West Camas Creek and its tributaries in and downstream of the Mine Ridge, Prospect Ridge, and Gold Ridge target drilling areas. Yellowstone cutthroat trout are hanging on in streams in and downstream of the Dog Bone Ridge target drilling area, including in Corral Creek and East Fork Rattlesnake Creek.

85.     The Forest Service admitted Excellon's drilling and road activities in Dog Bone Ridge create a risk of harm to Yellowstone cutthroat trout in Corral Creek and East Fork Rattlesnake Creek by altering flows and degrading water quality. But the Forest Service dismissed all risks as negligible. This conclusion is undermined by multiple flaws.

86.     First, for the same reasons that the Forest Service failed to adequately consider and protect against drilling impacts to groundwater and surface water stated in the previous section, the Forest Service similarly failed to consider and protect against adverse impacts to Yellowstone cutthroat trout in Corral Creek and East Fork Rattlesnake Creek.

87.     Second, the Forest Service claimed any risks to Yellowstone cutthroat trout will be negligible because: "Drilling activities will be located far from the perennial reaches of these streams where the trout reside." However, during the spring most years, and beyond spring in high water years, Yellowstone cutthroat trout may move upstream into headwater reaches that provide temporary habitat. But the Forest Service never considered when and to what extent fish may be present in upper reaches of Corral Creek, East Fork Rattlesnake Creek, and their

tributaries in closer proximity to Excellon's road construction, road use, and exploration drilling. The Forest Service wrongly assumed, without surveys, that fish do not reach those areas.

88.     Third, the Forest Service failed to account for the additional effects logging and road construction from the Porcupine Lookout Vegetation Project will have on Yellowstone cutthroat trout throughout the Corral Creek and Rattlesnake Creek drainages. It is well established that logging and associated road construction and use can deliver sediment to nearby streams and harm fish and degrade fish habitat. In the DN/FONSI and other project documents, the Forest Service admitted Porcupine Lookout will overlap with the Kilgore Project, both temporally and geographically, but the Forest Service failed to provide detailed information, analysis, or mitigation for the combined effects of these two Projects.

Wildlife and Wildlife Habitat

89.     Project documents confirm that Excellon's exploration activities will adversely affect wildlife and their habitat, but the Forest Service dismissed all such impacts as insignificant.

90.     The Kilgore Project will impact grizzly bears in the area in multiple ways, including: exploration activities and their associated noise, light, and vehicle traffic will disturb bears; on-site workers increase the risk of human-bear conflict; removal of whitebark pine will diminish an important food source for grizzly; and road construction will decrease secure bear habitat. The Forest Service downplayed these adverse effects to grizzly by emphasizing the lack of radio collared bears in the area, and by claiming there is "no important grizzly bear habitat" in the area. In reality, bears do visit the area, there is grizzly habitat, and grizzly presence should be expected to increase in this part of the GYE, as bear populations increase.

91.     Figure 6 below shows human-grizzly conflicts in Idaho, and the westernmost

conflict occurred near West Camas Creek, near the Kilgore Project.



*Fig. 30. Documented human-grizzly bear conflicts inside (red circles) and outside (yellow circles) the Demographic Monitoring Area in the Idaho portion of the Greater Yellowstone Ecosystem, 1992–2019. Base map source: National Geographic World Map, ESRI, Redlands, California.*

**_Fig. 6_**     *Reproduction of Fig. 30 in 2019 Annual Report from the IGBST showing westernmost huma-grizzly conflict near West Camas Creek.*

92.     Adding to the Kilgore Project's adverse effects to grizzly, Porcupine Lookout

logging and road activities will further reduce bear security, increase the risk of conflict with

humans, and disturb bears. But beyond acknowledging the potential for cumulative effects from

Porcupine Lookout, the Forest Service failed to disclose or consider important details about

Porcupine Lookout and how it will add to negative effects to grizzly.

93.     The Forest Service developed only one mitigation measure to protect grizzly

bears: requiring Excellon's on-site workers to follow the forest-wide food storage order. There

are other feasible and important measures that can minimize the Exploration's impacts to grizzly.

In their public comments, ICL and GYC urged the Forest Service to require Excellon to report grizzly sightings, to temporarily cease operations in the event that a grizzly is encountered, to require on-site workers to take Living in Bear Country training and to carry bear spray, to consider other measures to reduce noise and light pollution, and to minimize road construction. But the Forest Service refused to adopt any of these reasonable measures.

94.     Project documents also show the Kilgore Project will harm whitebark pine. The Forest Service admitted Excellon will be unable to avoid removing some whitebark pine seedling and sapling individuals when clearing forest to build roads and drill pads. And while Excellon is supposed to avoid existing, mature whitebark pine "to the extent possible," Excellon intends to build roads and drill pads in areas with mature whitebark pine. But the Forest Service dismissed these impacts to whitebark pine as "not likely to contribute to a trend towards federal listing or loss of viability."

95.     Contrary to the Forest Service's claim, whitebark pine are being listed as threatened, and the Kilgore Project will contribute to that trend. This is particularly concerning because denser areas of healthy whitebark pine at the Project site are in the Dog Bone Ridge area, which is the part of the Kilgore Project that overlaps with the Porcupine Lookout logging project. But the Forest Service never disclosed or evaluated important information about logging and road construction for Porcupine Lookout or how that will add to the loss of whitebark pine caused by the Kilgore Project.

96.     The Forest Service also failed to require mitigation measures recommended by ICL and GYC, including planting whitebark pine as part of Excellon's required reclamation activities, even though ICL and GYC urged the Forest Service to require this, and even though Forest Service staff have noted that this is a feasible mitigation measure.

97.     Elk will also be adversely impacted by the Kilgore Project. Road construction harms elk by decreasing each of two important measures: (1) elk security, which is a measure of elk vulnerability during hunting season; and (2) elk habitat effectiveness, which is determined by the motorized road density in elk summer range. As the Forest Service recognized in project documents, in order to support elk populations, secure elk habitat should be at least 30% of the area, and elk habitat effectiveness should be at least 50% for winter range and 70% for summer range. Even though Excellon's road construction will reduce elk security to 31% (barely above the 30% threshold) and reduce habitat effectiveness to 50% (right at the minimum threshold and far below the 70% target for summer range), the Forest Service brushed this off as insignificant.

98.     Additionally, the Forest Service failed to disclose and consider key information about the cumulative effects of the Porcupine Lookout project, which will reduce elk security and habitat effectiveness even further, presumably below the acceptable thresholds for supporting elk. Furthermore, the Forest Service had virtually no information about elk populations in the area when it concluded the impacts to elk would be insignificant.

Failure to Consider Alternatives

99.     There are many unresolved conflicts surrounding the Kilgore Project and many valid alternatives to Excellon's proposal. ICL, GYC, and other commenters identified multiple feasible alternatives that could significantly reduce the adverse impacts. But in the Final EA, the Forest Service considered only Excellon's proposal against a No Action Alternative.

100.    ICL and GYC urged the Forest Service to develop an alternative that would limit drilling to daylight hours only, to reduce disturbance impacts to wildlife. The Forest Service admitted the Kilgore Project will have adverse effects on threatened wildlife (lynx and grizzly), sensitive species (American three-toed woodpecker, boreal owl, gray wolf, great grey owl), elk,

and migratory birds. Daylight-only drilling would reduce the adverse disturbance effects to these species compared to nonstop activity, noise, and light from 24-hour drilling. But the Forest Service unreasonably rejected daylight drilling as an alternative to study in the EA.

101.    ICL and GYC also urged the Forest Service to develop an alternative that would utilize helicopters to access all or some of the drilling areas in order to reduce new road construction. Road construction, use, and maintenance have short-term and long-term adverse impacts to water quality, fisheries, wildlife, and forest, including adverse impacts to Yellowstone cutthroat trout, Columbia spotted frog, grizzly bear, lynx, elk, whitebark pine, and other species of concern. The Forest Service previously approved Otis Gold's proposal to use helicopter supported drilling during earlier stages of its exploration activities at Kilgore. Other mineral exploration projects in Idaho have successfully utilized helicopter drilling. And the Forest Service admitted helicopter drilling meets the Project's purpose and need, reduces surface disturbance, reduces habitat fragmentation, and reduces visual impacts. But the Forest Service unreasonably rejected it as an alternative to study in the EA.

**FIRST CLAIM FOR RELIEF:**
**Forest Service NEPA & APA Violations:**
**Failure to Prepare EIS**

102.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

103.    This claim challenges the Forest Service's violations of NEPA and NEPA's implementing regulations, by authorizing the Kilgore Project without preparing an EIS. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

104.    NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

105.     As alleged above and will be further presented in briefing, the DN/FONSI and the EA upon which it is based are not supported by the facts, fail to consider important factors, and are otherwise arbitrary and capricious. The Kilgore Project may have significant impacts because of the likely, highly controversial, unknown, and/or uncertain direct, indirect, and cumulative impacts to water quality, Yellowstone cutthroat trout, whitebark pine, grizzly bear, elk, other special-status species, and their habitat, which will be adversely affected by Excellon's 24-7 drilling, drill station construction, and road construction and use, as well as the additive and unexamined effects of the Porcupine Lookout Vegetation Treatment Project.

106.     Because the Forest Service violated NEPA's requirements by approving the Kilgore Project through an inadequate DN/FONSI and EA and by failing to prepare an EIS, its action is arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA, and that action must be held unlawful and set aside under 5 U.S.C. § 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below

## SECOND CLAIM FOR RELIEF:
### Forest Service NEPA and APA Violation:
### Failure to Consider Reasonable Range of Alternatives

107.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

108.     This claim challenges the Forest Service's violations of NEPA and NEPA's implementing regulations, by authorizing the Kilgore Project without considering a reasonable range of alternatives required by NEPA. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

109.     As alleged above and will be further presented in briefing, the Forest Service

failed to consider a reasonable range of alternatives, in violation of NEPA. 42 U.S.C § 4332(E);

40 C.F.R. § 1502.14 (1978); 40 C.F.R. § 1501.2(b)(3) (2020). In the EA, the Forest Service

considered only Excellon's proposal and a no action alternative. Plaintiffs and other commenters

and objectors urged the Forest Service to consider other feasible alternatives, including limiting

drilling to daylight periods and using helicopter drilling, each of which may significantly reduce

adverse effects while allowing Excellon to complete its full drilling proposal. But the Forest

Service arbitrarily and capriciously refused to consider these or any other action alternatives.

110.     The Forest Service's approval of the Kilgore Project through the DN/FONSI and

EA is thus arbitrary, capricious, an abuse of discretion, not in accordance with the law, without

observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or

limitations within the meaning of the judicial review provisions of the APA, and that action must

be held unlawful and set aside under 5 U.S.C. 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF:
**Forest Service NEPA & APA Violations:**
**Failure to Take a Hard Look**

111.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

112.     This claim challenges the Forest Service's violations of NEPA and NEPA's

implementing regulations, by authorizing the Kilgore Project based on the defective EA without

taking a "hard look" at potential environmental impacts as required by NEPA. Plaintiffs bring

this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

113.    NEPA requires agencies to take a hard look at the direct, indirect, and cumulative effects of its proposed action and all alternatives in an EA. 40 C.F.R. § 1508.7, 1508.8 (1978); 40 C.F.R § 1501.2(b) (2020); 85 Fed. Reg. 43,304 (Sep. 14, 2020); 36 C.F.R. §§ 220.4 & 220.7.

114.    As alleged above and will be further presented in briefing, the Forest Service failed to take a hard look at the Kilgore Project's likely effects to groundwater and surface water, Yellowstone cutthroat trout, grizzly bear, elk, and other environmental factors by failing to gather important baseline information, failing to adequately consider the Project's effects, and failing to adequately consider cumulative effects of the Porcupine Lookout Vegetation Treatment Project, and other errors, omissions, and unsupported assumptions in the EA and DN/FONSI.

115.    By relying on the defective DN/FONSI and EA, the Forest Service's action approving the Kilgore Project is arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA, and that action must be held unlawful and set aside under 5 U.S.C. 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below.

### FOURTH CLAIM FOR RELIEF:
**Organic Act Violations:**
**Failure to Minimize Impacts & Protect Fish & Wildlife**

116.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

117.    This claim challenges the Forest Service's violations of the Organic Act and the Organic Act implementing regulations by authorizing the Kilgore Gold Exploration without protecting fish, wildlife, and the environment. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

118.    Forest Service mining regulations require the Forest Service to maintain and protect fish and wildlife resources and to ensure miners take all feasible steps to minimize adverse environmental effects. 36 C.F.R. 228.4(c)(3), 228.8(e).

119.    As alleged and will be further presented in briefing, the Forest Service failed to impose feasible requirements to protect fish and wildlife and to minimize the adverse environmental effects of the Kilgore Project. These include failing to require adequate monitoring of surface water and groundwater quality; failing to locate and avoid drilling near historical mining features; failing to require that drilling sumps be lined and that sump materials be disposed off-site; failing to adopt measures to protect for Yellowstone cutthroat, grizzly bear, whitebark pine, and elk; and failing to consider daylight drilling and helicopter-supported drilling alternatives that could better protect wildlife.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Idaho Conservation League and Greater Yellowstone Coalition respectfully request that this Court grant the following relief:

A.    Order, declare, and adjudge that the Forest Service's DN/FONSI and EA approving the Kilgore Gold Exploration Project are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under NEPA, the Organic Act, and/or the APA;

B.    Vacate, set aside, reverse, and remand the Kilgore Gold Exploration Project EA and DN/FONSI;

C.    Order the Forest Service to prepare an EIS;

D.    Enter such temporary, preliminary, or permanent injunctive relief as Plaintiffs may hereafter seek;

E.      Award Plaintiffs their reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. and all other applicable authorities; and

F.      Grant such further and additional relief as the Court deems just and proper in order to remedy Defendants' violations of law and protect Plaintiffs and the public interest.

Dated this 26th day of May, 2022.

Respectfully submitted,

*/s/ Bryan Hurlbutt*
Bryan Hurlbutt (ISB #8501)
Laurence ("Laird") J. Lucas (ISB #4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org
llucas@advocateswest.org

Roger Flynn (*pro hac vice pending*) (Colo. Bar # 21078)
WESTERN MINING ACTION PROJECT
P.O. Box 349
Lyons, CO 80540
(303) 823-5738
(303) 823-5732 (fax)
wmap@igc.org

*Attorneys for Plaintiffs*