## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, and GREATER YELLOWSTONE COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FOREST SERVICE,<br><br>Defendant,<br><br>and<br><br>EXCELLON IDAHO GOLD, INC., an Idaho corporation,<br><br>Defendant-Intervenor. | Case No. 1:22-cv-00225-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

This case involves a challenge to the U.S. Forest Service's approval of the Kilgore Gold Exploration Project in the Caribou-Targhee National Forest. Plaintiffs Idaho Conservation League and the Greater Yellowstone Coalition allege that the Forest Service's decision approving the project is arbitrary and capricious in violation of the National Environmental Protection Act, the Organic Act, and the Administrative Procedures Act. Before the Court are the parties' cross-motions for

**MEMORANDUM DECISION AND ORDER - 1**

summary judgment. Dkts. 19, 22, 24. For the reasons set forth below, the Court grants the defendants' and intervenors' motions and denies the plaintiffs' motion.

## BACKGROUND

The U.S. Forest Service manages mineral development in the Caribou-Targhee National Forest. Intervenor Excellon Idaho Gold owns mining claims on the Dubois Ranger District of the Forest. In 2008 and 2014, the Forest Service allowed Excellon to undertake mineral exploration activities, which basically involved drilling exploratory holes to obtain samples to assess the grade, tonnage, and extent of minerals underlying the site.

In 2017, Excellon sought approval of an additional, more expansive exploration project. The five-year Kilgore Gold Exploration Project involved the construction of 10 miles of road and 140 drilling stations and would have allowed exploratory drilling for 24 hours a day from mid-July to November at up to 420 new exploratory holes. Excellon submitted a proposed plan of operations for the project. After issuing an Environmental Assessment (EA) in 2018, the Forest Service approved the project with a Final Decision Notice and Finding of No Significant Impact (DN/FONSI). ICL challenged that administrative decision in a case before this Court. *See Idaho Conserv. League v. U.S. Forest Serv.*, 429 F. Supp. 3d 719 (D. Idaho 2019).

The Court held that "the Forest Service acted arbitrarily and capriciously under the APA when it failed to take the hard look mandated by NEPA at the impacts of the Project on (1) the groundwater of Dog Bone Ridge, and (2) how that groundwater from Dog Bone Ridge drainage will impact the Yellowstone cutthroat trout in Corral Creek" and initially remanded the case to the Forest Service to review those concerns. *Id.* at 733. Shortly after, the Court granted ICL's motion to alter the judgment and vacated the 2018 DN/FONSI and the EA entirely. *Id.* at Dkt. 53.

In July 2020, Excellon submitted a revised Plan of Operations for the Kilgore Project to the Forest Service. The revisions were not all that significant. Excellon again asked the Forest Service to authorize five years of exploratory activities. The plan proposed constructing 10.2 miles of road and 130 drill stations and drilling up to 390 exploratory holes to an average depth of 1,300 feet. Excellon proposed operating up to three drill rigs nonstop from mid-July to mid-December.

The Forest Service released a Draft EA in January 2021 followed by a Final EA and a draft DN/FONSI approving the project in June. In the new documents, the Forest Service "updated, revised, or [provided] new analyses that examined the potential effect of the proposed plan of operations on: surface water; groundwater; threatened, endangered and sensitive wildlife and plants; fisheries; and soils." Dkt.

22 at 12. In November, the Forest Service issued a final DN/FONSI approving the Kilgore Project.

In March 2022, ICL moved to reopen that case and file a supplemental complaint challenging the new administrative decision. Both the Forest Service and Excellon opposed that motion. The Court denied the motion finding that "the proposed supplemental complaint is a new and distinct action challenging a different final agency action. These new claims belong in a new case."[1] Dkt. 64. Thereafter, in May, ICL filed this case. All parties now move for summary judgment on all claims.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material

---

[1] The Forest Service argues that ICL has inappropriately sought "a second bite at the apple" by expanding their arguments beyond the claims brought in the earlier case. Dkt. 22 at 20. They ask the Court to "reject this gamesmanship and find that the 2021 EA satisfied the Court's limited remand." *Id.*

That argument is a nonstarter. As the Forest Service successfully argued in opposing the motion to reopen the earlier case, the 2022 approval is a "a new project and environmental analysis." Dkt. 62 at 2. Indeed, it involves a new plan of operations, NEPA notice and comment process, Environmental Assessment, and DN/FONSI. ICL has the right to challenge that new agency action on any suitable grounds without constraints from the previous case.

If the facts and legal issues now presented were narrowly identical to the previous case, the Court would not revisit its decision. But that is not the case. The arguments and facts now before the Court are sufficiently distinguishable from those previously brought to justify new consideration.

fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe of Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Because this is an agency action case, the Court may grant summary judgment to either party based upon a review of the administrative record. *Id*.

A federal agency's compliance with environmental laws is reviewed under the Administrative Procedure Act. 5 U.S.C. § 706; *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1070 (9th Cir. 2009). Under the APA, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996). An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Id*.

Thus, the agency must set forth clearly in the administrative record the

grounds on which it acted. *See Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412
U.S. 800, 807 (1973). A court may not accept an agency's post hoc rationalizations
for its action. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*, 463 U.S. 29, 50 (1983) (citation omitted). "It is well-established that an
agency's action must be upheld, if at all, on the basis articulated by the agency
itself." *Id*. (citations omitted).

The reviewing court's inquiry must be "thorough," but "the standard of
review is highly deferential; the agency's decision is entitled to a presumption of
regularity, and [the court] may not substitute [its] judgment for that of the agency."
*Id*.; *see also Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927
(9th Cir. 2008) (holding that although a court's review is deferential, the court
"must engage in a careful, searching review to ensure that the agency has made a
rational analysis and decision on the record before it"). To withstand review under
the APA, "the agency must examine the relevant data and articulate a satisfactory
explanation for its action including a rational connection between the facts found
and the choice made." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

## ANALYSIS

The bulk of ICL's claims fall under NEPA, which "imposes procedural
requirements, but not substantive outcomes, on agency action." *Lands Council v.*

*Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Marsh v. Or. Natural Res.*

*Council*, 490 U.S. 360, 371 (1989)). NEPA requires federal agencies to "assess the

environmental impact of proposed actions that 'significantly affect[ ] the quality of

the human environment.'" *Wildearth Guardians v. Provencio*, 923 F.3d 655, 668

(9th Cir. 2019) (quoting 42 U.S.C. § 4332(C)).

NEPA "serves two fundamental objectives. First, it ensures that the agency,

in reaching its decision, will have available, and will carefully consider, detailed

information concerning significant environmental impacts." *Id*. (quotation and

citation omitted). "[S]econd, it requires that the relevant information will be made

available to the larger audience that may also play a role in both the decision-

making process and the implementation of that decision." *Id.* (quotation and

citation omitted). The purpose of these two objectives "is to ensure that the agency

will not act on incomplete information, only to regret its decision after it is too late

to correct." *Id*. (quotation and citation omitted).

"[T]o accomplish this, NEPA imposes procedural requirements designed to

force agencies to take a 'hard look' at environmental consequences." *Powell*, 395

F.3d at 1027 (citation omitted). Further, courts are to "strictly interpret the

procedural requirements in NEPA to the fullest extent possible consistent with the

policies embodied in NEPA. [G]rudging, pro forma compliance will not do."

**MEMORANDUM DECISION AND ORDER - 7**

*WildEarth Guardians*, 923 F.3d at 668 (cleaned up) (quotation and citation omitted). Finally, "agencies must ensure 'that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.'" *Id.* (quoting 40 C.F.R. § 1500.1(b)).

With this statutory framework in mind, the Court turns to its analysis of plaintiffs' NEPA claims.

### A.    NEPA Hard Look

NEPA requires federal agencies take a "hard look" at the environmental consequences of their proposed actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). "[F]or a proposed action that is not likely to have significant effects or when the significance of the effects is unknown," an agency may prepare an EA that takes a hard look at the direct, indirect, and cumulative effects of its proposed action and all alternatives. 40 C.F.R. § 1501.5(a). A hard look is a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). It is not sufficient to merely provide "[g]eneral statements about 'possible' effects and 'some risk' . . .

absent a justification regarding why more definitive information could not be provided." *Id.* at 1380.  Similarly, "conclusory statements, based on vague and uncertain analysis . . . are insufficient to satisfy NEPA's requirements." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) (quotation omitted).

Here, ICL argues that the Forest Service's decision is defective because it did not take the requisite hard look at the impacts of drilling on ground water and surface water or at the cumulative effects of the Porcupine Lookout Vegetation Treatment Project. These arguments fail, because the record shows that the EA contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain*, 137 F.3d at 1376.

### 1.  Impacts of Drilling on Groundwater and Surface Water

ICL claims the Forest Service violated NEPA because it failed to take a hard look at the potential effects that exploration drilling could have on groundwater and surface water. Specifically, ICL contends that drilling can cause contamination in three ways: "Drilling fluid and water mixing with drill cuttings can overflow into surface water, or can infiltrate into groundwater"; "Groundwater can mix with other groundwater of differing chemical composition through aquifer crossflow caused while drilling"; "Surface water and groundwater of differing chemical composition can mix as a result of drilling and cause cross contamination." Dkt. 19

at 17. In light of these risks, ICL contends, the Forest Service failed to adequately consider the dangers of contamination from historic mine features, to establish baselines of groundwater quality and hydraulic connectivity necessary to measure and understand contamination, and to put in place adequate monitoring necessary to measure and understand contamination. *Id*. at 18-26.

All these claims fail because they are predicated on the assumption that drilling is likely to cause contamination. The record shows, however, that the Forest Service took a hard look at the risks of drilling causing contamination and determined that they were non-existent or insignificant given the drilling methodology and designs. The Forest Service consequently found that ground and surface water contamination did not warrant further action. That analysis satisfies NEPA.

### a.  Drilling Design and Water Impact Analysis

The EA prescribes a very particular drilling design. The drilling fluid must be "composed of the makeup water used to mix the drilling mud, bentonite, and a small quantity of drilling additives." AR024025. The water has to come from an on-site water well and unpolluted area streams, which will "be equal to or better than the expected groundwater quality that could be encountered in a drill hole." *Id.* The drilling polymers must be "non-toxic, biodegradable, and certified for use

in drilling drinking water wells." *Id.* As these materials are used to drill the holes, the process produces a low permeability filter cake that lines the bore hole. *Id.* An illustration in the EA demonstrates the filter cake design:



AR024026. With this design in mind, the Forest Service assessed several possible risks of "natural and drilling inducted surface water/groundwater interactions"— which it noted "are important to consider for this project"—and concluded none were likely. AR024025.

First, the Forest Service considered the risk of drilling fluid mixing with groundwater. The agency determined that quality of the drilling fluid water and other materials made these risks "insignificant." *Id.* Moreover, the filter cake

**MEMORANDUM DECISION AND ORDER - 11**

allows "only a small volume of filtrate to enter the formation" during the time the bore hole is open, causing only "localized and negligible" effects. *Id.*

Next, the EA discussed the likelihood of groundwater mixing with other groundwater through crossflow. The Forest Service explained that such risks were minimized by (1) the filter cake "sealing off any inflows or outflows of water as they are encountered" during drilling and (2) "casing and cementing all holes through any near-surface unconsolidated formations into bedrock when holes are abandoned." AR024026. As a result, the Forest Service concluded, the "[o]verall effects to the receiving aquifer would be negligible and temporary." *Id.*

The Forest Service also addressed the risk of surface water and ground water mixing. The EA explained that drilling does not create a risk of surface water flowing into the drill hole and mixing with ground water "because all the drill holes have surface casing that typically rises several feet above the surrounding pad surface which is graded to shed water." FS024027. Likewise, the likelihood of groundwater contaminating surface water is minimized through "[t]he low permeability of the local aquifers, slow rate of groundwater flow, and the low probability of groundwater quality being affected by drilling fluid or aquifer crossflow." AR024027. These factors, the EA found, "minimize the probability of groundwater contaminants migrating to a discharge point." *Id.*

MEMORANDUM DECISION AND ORDER - 12

Finally, the EA considered the risks of contamination from drilling fluids that contain drill cuttings. These drilling fluids will be contained in sumps. AR024027. "Most of the drying of a collection sump takes place by evaporation, but a small volume of fluid would infiltrate into the soil. This fluid is not expected to move far beyond the immediate vicinity of the sump." *Id.* Toxic materials are "unlikely" to "migrate into shallow groundwater" because bentonite clay has low permeability and high cation exchange capacity that isolates potential environmental contaminates. *Id.* As a result, the Forest Service determined that "[t]he quantity of cuttings and material generated from the drill hole is relatively small and inconsequential in terms of the potential for acid generation. Disposal of cuttings will be localized and poses little risk of groundwater contamination." AR024028.

Based on all this analysis, the Forest Service concluded that "the potential impacts to groundwater resources from the proposed exploration drilling activities are assessed to be minimal and negligible." AR024029. That finding and underlying analysis satisfy NEPA. In short, the EA identifies numerous contamination effects drilling *could* have on ground and surface water—going even further than the issues ICL contemplates—and explains how they have been eliminated or minimized to the point of insignificance. As the reasoned

conclusions of Forest Service experts, the findings are entitled to deference. *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012).

                *b.*   ICL's Water Claims

ICL fails to demonstrate shortcomings in the EA. The Court will briefly address its four arguments.

First, ICL raises issues about potential groundwater contamination if drilling encounters historic mine features. The claim is based on the Forest Service's *Working Guide*. AR013787-822. Indeed, the *Working Guide* appendix worksheet for drilling projects recommends the agency consider whether there are "any abandoned or active mine features in the area" and whether drilling will "intercept underground workings" because "[t]hese features can provide conduits to groundwater flow and/or increase the risk of groundwater and surface water contamination." AR013805. ICL argues that NEPA requires the Forest Service to "consider the effects Excellon's drilling near these [historic mine] features could have—such as by providing conduits to groundwater flow or increasing the risk of groundwater and surface water contamination." Dkt. 19 at 19.

Not so. The EA shows that the Forest Service took historic mining features into account when establishing the environmental baseline. AR007625-26. As discussed above, the EA specifically anticipated the drilling design, and

particularly the filter cake, would address the precise contamination concerns that the *Working Guide* says that historic mining features raise. In fact, the *Working Guide* recommends such drilling design measures to address the contamination risks from "underground mines" especially when "their location and extent are not well documented." AR012798-99. Because the EA sufficiently considered the very contamination issues that historic mines can cause, it contained the required "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain*, 137 F.3d at 1376. The Court declines to read the *Working Guide* as a strict requirement. The Forest Service satisfied NEPA by considering every significant aspect of contamination.

Next, ICL argues that the Forest Service violated NEPA because it failed to gather sufficient baseline information about groundwater hydrology and hydraulic connectivity before approving the project. NEPA imposes "a duty to assess, in some reasonable way, the actual baseline conditions" in a project area. *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019) (citing *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016)). "An agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101

(9th Cir. 2016). Thus, the reasonableness of the baseline conditions assessment naturally depends on the nature and context of the project being evaluated. Here, the Forest Service found that the project would only have minimal or negligible potential effects on groundwater and surface water. Against the backdrop of limited, low probability effects, the baseline data the Forest Service gathered is reasonable and fully satisfies NEPA.

The EA and hydrogeology specialist report discussed the hydrogeology of the project area as a whole, and specifically the Dog Bone Ridge area that was the subject of remand. AR024021-29; AR013776-85. The EA considered the local geology, including rock types and formations, on both the east and west sides of the project area. *Id.* Then the EA set out in detail the consequent effects on groundwater and stream flows. *Id.* (discussing seep and spring localities in the geologic data). The EA also considered the groundwater quality monitoring from the east side and explained that "groundwater monitoring on the east side accurately estimates conditions on the west side." AR024025; AR007642. Moreover, the EA took into account the surface water quality monitoring for the entire project area. AR024025. Based on these data, the hydrogeologic report established an understanding of the project area's hydroconnectivity. AR012134-41; AR012773-75. In short, the hydrogeology report used hydrogeology, surface

water mapping, and other estimations to model groundwater and surface water connectivity. Taken together, this amounts to a reasonable, adequate baseline—particularly in light of the low probability of any effects to ground or surface water from the exploration project.

Finally, ICL take issue with the Forest Service's anticipated water quality monitoring, which ICL claims is an improper "substitute for gather and analyzing pre-project baseline data." Dkt 19 at 24. However, the Court has found that the Forest Service complied with NEPA by considering substantial baseline data. Accordingly, this argument fails. What is more, ICL has not presented any persuasive reason that why water quality monitoring based on Idaho's "Alternative Concentration Limit" method would itself violate NEPA in the context of this project.

### 2. Cumulative Effects of the Porcupine Lookout Vegetation Treatment

NEPA requires federal agencies to take a hard look at the cumulative effects of the proposed action. "Cumulative effects . . . are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." 40 C.F.R. § 1508.1. In this case, ICL argues that the Forest Service failed to take a hard look at the cumulative effects of the Porcupine Lookout Vegetation Project. The Court is not persuaded.

MEMORANDUM DECISION AND ORDER - 17

The Forest Service released a project initiation letter for the Porcupine

Lookout Vegetation Project in September 2020. In the FONSI and EA for the

Kilgore Project, the Forest Service explained that,

> Th[e] Porcupine Lookout Vegetation] project could result in up
> to 4,000 acres of surface disturbance related to the harvest of
> forested stands. Most of this would be the logging of
> merchantable timber, with a small percentage of forested stands
> being treated by activities such as noncommercial thinning,
> piling, pile burning, chopping, and mastication.
>
> The Porcupine Lookout Vegetation Project would overlap with
> the Kilgore Gold Exploration project. There are two small
> harvest areas totaling 60 acres within the Dog Bone Ridge
> target area. Harvest activities associated with the Porcupine
> project would occur as early as 2023. Kilgore exploration
> drilling could occur between 2021 and 2025.

AR024070; AR024015.

This analysis satisfies NEPA because the Porcupine Lookout project is in the

very early stages of agency action. There has been a project initiation letter, but not

even NEPA scoping. That means that the project is not ready for agency

consideration. Given that, the Forest Service adequately assessed the cumulative

effects of these very tentative plans in its Kilgore analysis. Further analysis would

necessarily be inappropriately speculative and impractical, because the Porcupine

Lookout Project is still being developed.[2]

### 3. Failure to Prepare EIS

ICL also contends that the Forest Service should have prepared an EIS for the Kilgore Project. NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). ICL argues that its hard look claims raise substantial questions about whether the Kilgore Project will have significant impacts.[3] Because the hard look claims fail, so does the EIS claim. Put simply, ICL has not shown that the

_____

[2] *See Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) (holding that NEPA's cumulative effect analysis requirement does not "require the government to do the impractical, if not enough information is available to permit meaningful consideration) (quotation and citation omitted); *League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014) ("Although projects need not be finalized before they are reasonably foreseeable, they must be more than merely contemplated.") (quotations omitted); *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 27 (D.D.C. 2016) ("[W]here a future action is too inchoate to permit an agency to analyze its impacts, it is not arbitrary and capricious for the agency to exclude it from, or lessen its relative import in, its cumulative impacts analysis, even if the agency has labeled the action 'reasonably foreseeable.'").

[3] *See* Dkt. 28 at 36 ("For any of the reasons above that the Forest Service failed take a hard look, there 'may' be significant impacts, rendering the Forest Service's finding of no significant impact arbitrary and capricious and triggering NEPA's EIS requirement."); Dkt. 19 at 42 ("[T]he Forest Service's lack of data and analysis about legacy mining features that pose a risk of contamination, its lack of groundwater quality data from anywhere except one location in the Project site, and the other ways it failed to take a hard look at risk drilling poses to groundwater and surface water . . . creates the possibility of significant effects that require assessment in an EIS."); *Id.* at 43 ("[T]he Forest Service's failure to adequately analyze the cumulative effects of the Kilgore Project together with Porcupine Lookout logging—including the cumulative loss and degradation of elk, grizzly, YCT, and whitebark pine habitat creates the potential for significant impacts and requires an EIS.").

MEMORANDUM DECISION AND ORDER - 19

Kilgore Project's impacts may be significant.

### B.    NEPA Range of Alternatives

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives" to the proposed project action in the EA. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008)). The EA must "give full and meaningful consideration to all *reasonable* alternatives" and is inadequate if there is "a viable but unexamined alternative." *Id.* (quotations and citations omitted) (emphasis added). However, "[i]n rejecting any alternatives, the agency must only include brief discussions of the need for the proposal, of alternatives required by 42 U.S.C. § 4332(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) (cleaned up). Here, ICL argues that the EA violates NEPA because the Forest Service did not consider the daylight and helicopter drilling alternatives. The Court is not persuaded.

ICL first focuses on an alternative that would limit drilling to daylight hours. The EA explained that this approach "would likely be beneficial to some resources (e.g., wilflife)" but rejected it because "it would result in increasing the overall

duration of the project." AR024005. ICL contends that "nothing in the record supports this assertion that daylight drilling would necessarily result in a longer Project" and that, even if it *is* true, "this is not a reasonable basis for refusing to develop this alternative." Dkt. 28 at 34. This argument is, to put it generously, a bit of a stretch. It takes only basic logic to understand that halving the hours of drilling time will increase—indeed, likely double—the length of a project with a fixed scope. This brief explanation is all NEPA requires. The Forest Service is well within its authority to reject the daylight drilling alternative on this basis, even if ICL disagrees with the wisdom of the decision.

ICL also claims that the Forest Service should have considered a helicopter drilling alternative. The EA explained that the Forest Service dismissed "the use of helicopters for moving equipment to drill stations to avoid road construction" after evaluating "effects to the resources at issue as well as potential health and safety considerations in comparison to a road supported program." AR024005. Indeed, the record shows that the Forest Service offered a reasonable explanation for rejecting this alternative in its detailed explanation of the advantages[4] and

---

[4] "Meets purpose and need[;] Reduces surface disturbance associated with road construction[;] Reduces habitat fragmentation from road construction[;] Reduces visual impacts associated with temporary roads." AR007834.

disadvantages[5] to helicopter drilling. In sum, the Forest Service rejected this alternative because it has higher costs and health and safety risks. This analysis is applicable whether helicopter drilling is used for some or all of the drilling areas. Thus, the Forest Service met NEPA's requirements for rejecting an alternative that includes drilling.

Finally, ICL takes issue with the Forest Service's decision to consider only the proposed action and the no action alternative in the EA. Simply put, there are always other alternatives that *could* be considered. So long as the agency provides

---

[5] "Spatial extent of disturbance may actually be greater depending on where and how far away helicopter staging area is located and the number of flights required to sling equipment for pad construction and drilling.
    There are no available staging areas in the project area, so Excellon would be required to obtain permission to use of other lands (e.g., private lands).
    Increased effects to area residents and recreationists due to road closures and noise/disturbance from multiple flights.
    May create larger area of wildlife displacement due to multiple flights and associated noise/disturbance.
    Disruptions may occur during hunting season due to potential for wildlife displacement.
    Overall duration of project would be lengthened due to the number of flights necessary to facilitate pad construction, drill and equipment placement, drill time and equipment de-mob.
    There would be added limitations to water transport and availability. Water would have to be piped and pumped from multiple tanks to facilitate drilling on a platform.
    Increased health and safety risks to the public, project crews, and environment. Helicopters are inherently dangerous, and the hazard increases when slinging equipment. The consequences of a helicopter accident are more serious than vehicular accidents. Helicopters cannot fly full due to weight considerations when slinging drill equipment, so they must refuel several times each day during a drill move. This requires that more fuel must be stored on site, or that fuel be transported into project area more frequently and in higher volume.
    Helicopter supported drilling is substantially more expensive. Estimates so not include stand-by time for helicopter and pilot, which could be several days between each drill move. (L. Pancoast, pers. comm, 2018)." AR007834.

sufficient explanation for rejecting the alternatives, NEPA only requires an EA to consider the no action alternative alongside the proposed action. Here, the Forest Service gave valid reasons not to consider each of the alternatives, which clearly came with some downsides. That satisfies NEPA.

### C.    Organic Act

The Organic Act imposes a dual mandate on the Forest Service to protect National Forests while allowing mineral exploration and development under federal mining law. The protection mandate is contained in § 551:

> The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests . . .; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction.

16 U.S.C. § 551. The mandate to allow mineral exploration and development, consistent with applicable rules and regulations, is contained in § 478:

> Nothing in section[] . . . 551 of this title shall be construed as prohibiting . . . . any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof. Such persons must comply with the rules and regulations covering national forests.

16 U.S.C. § 478. The Forest Service has set up rules and regulations "through which use of the surface of National Forest System lands in connection with the

operations authorized by the United States mining laws . . . shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1; *see also* 30 U.S.C. § 21-54 (mining laws). However, the Organic Act does not require that "when the Forest Service is forced to choose between project alternatives, environmental interests always trump mining interests." *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 478 (9th Cir. 2000). ICL offers several instances in which, it argues, the Forest Service violated the Organic Act. None are persuasive.

ICL first reiterates its claim that by using only a single site to monitor groundwater throughout the Project area, the Forest Service cannot "ensure that Excellon's drilling operations will not impair groundwater and will meet applicable water quality standards." Dkt. 19 at 44. As previously discussed, this argument fails because the Forest Service set out an adequate explanation to support its conclusion that the Kilgore Project will have minimal impact on groundwater. Nothing more is required.

Next, ICL contends that the Forest Service should have required lining for some or all of the sumps that will hold drill cuttings rather than allowing drilling fluids "to evaporate and infiltrate the ground." Dkt. 19 at 45. Once more, the Court has already addressed this issue: the Forest Service determined that only "a small

volume of [drill cutting] fluid would infiltrate the soil from the sumps" and "is not expected to move far beyond the immediate vicinity of the sump." AR024027. Given these very minimal impacts, the Forest Service's reasoning and decision is not arbitrary or capricious.

Third, ICL restates its claim that "limiting drilling to daylight and/or utilizing some helicopter drilling is feasible and would minimize impacts to wildlife . . . but the Forest Service is not requiring either." Dkt. 19 at 45. For the reasons discussed above, this claim fails.

Finally, ICL is concerned with the Forest Service's mitigation measures concerning grizzly bears and the whitebark pine. As to the grizzlies, ICL contends that other measures should have been followed, such as requiring Excellon "to report grizzly sightings, to temporarily cease operations in the event that a grizzly is encountered, to require on-site workers to take Living in Bear Country training, and to carry bear spray." Dkt. 19 at 45. As to the whitebark pine, ICL claims that the Forest Service should have adopted an additional protective measure— directing Excellon to "continue to support Forest Service efforts in collecting whitebark pine seeds from blister rust resistant individuals to enhance conservation efforts." Dkt. 19 at 46. Both of these claims fail because the EA and specialist reports establish that potential impacts to wildlife, including grizzly bears and

whitebark pines, are negligible, insignificant, without measurable effect, and short term. *See* AR023958-62, AR023985, AR023995 (grizzly bear); AR011231-37. AR024038, AR011235, AR011272-73 (whitebark pine). These findings are supported by evidence and entitled to deference, particularly for this exploratory drilling project.

## ORDER

1. Defendant and Intervenor's motions for summary judgment (Dkt. 22; 24) are GRANTED.

2. Plaintiffs' motion for summary judgment (Dkt. 19) is DENIED.

3. The Clerk of the Court shall close this case.

DATED: August 4, 2023

B. Lynn Winmill
U.S. District Court Judge

**MEMORANDUM DECISION AND ORDER - 26**